FILED
2022 Jan-05  AM 09:18
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **BOBBIE BREEDING,** } | |
| } | |
| **Plaintiff,** } | |
| } | |
| **v.** } | **Case No.:  2:20-CV-00551-RDP** |
| } | |
| **INTEGRATED BEHAVIORAL** } | |
| **HEALTH, INC.,** } | |
| } | |
| **Defendant.** } | |

## <u>MEMORANDUM OPINION</u>

This case is before the court on Defendant's Motion for Summary Judgment seeking dismissal of Plaintiffs' various discrimination claims. (Doc. # 30). The Motion has been fully briefed (Docs. # 32, 37, 40)[1] and is ripe for review. After careful review, and for the reasons discussed below, Defendant's Motion (Doc. # 30) is due to be granted.

## I.    Background[2]

Plaintiff Bobbie Breeding was hired in 2007 by American Behavioral Health Benefit Managers ("American Behavioral") as Director of Sales (Doc. # 31-1 at 11). Her starting annual salary was $90,000, and her duties included generating new sales and account management. (*Id.* at 11-12). Defendant Integrated Behavioral Health, Inc. ("IBH") acquired American Behavioral in 2016. (*Id.* at 23). Plaintiff's duties did not change after the acquisition; however, in November 2016, Plaintiff and Defendant agreed to a sales goal of $200,000. (*Id.* at 24-25).

---

[1] The court ordered Defendant to refile briefs with corrected record citations. (Docs. # 43, 44).

[2] The facts set out in this opinion are gleaned from the parties' submissions and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

In May 2018, Periscope Equity, LLC ("Periscope") acquired a majority interest in Defendant. (*Id.* at 21; Doc. # 31-10 at 10-11; Doc. # 31-33 at 2-3). As part of Periscope's strategy to increase profitability, on November 12, 2018, Defendant hired David Sockel as Chief Commercial Officer. (Doc. # 31-1 at 29-30; Doc. # 31-9 at 16, 32; Doc. # 31-13 at 5; Doc. # 31-10 at 11). Sockel's direct sales reports consisted of three males and five females. (Doc. # 31-9 16-24; Doc. # 31-18 at 14).

Sockel thought his team (including Plaintiff) was lacking. As he put it, "there was no one on the Sales team dedicated solely to generating new business . . . , which I refer to as hunting." (Doc. # 31-33 ¶ 10). Instead, his team members did what he "refer[s] to as farming." (*Id.*). That is, they "either had executive operational responsibilities and/or spent a considerable amount of time performing account management functions[.]" (*Id.*).

On November 16, 2018, Sockel approached a recruiting firm to recruit "hunters"—that is, salespeople focused exclusively on generating new business sales (Doc. #31-8 at 34; Doc. # 31-29 at 11). The firm recommended Peter Hendrixson, who worked for one of Defendant's competitors in the Midwest. (Doc. # 31-9 at 47; Doc. # 31-33 at 6). During the negotiation period, the recruiting firm reported that Hendrixson had a then-current base salary of $120,000, plus a company car and cell phone allowance. (Doc. # 31-9 at 43). Sockel offered to hire Hendrixson on January 23, 2019, at a base salary of $125,000. (Doc. # 31-19 at 40). While the job description included a sales goal of $500,000-1 million, Sockel and Hendrixson agree that Sockel's offer to Hendrixson had a $1 million sales goal. (Doc. # 31-14 at 14, 48; Doc. # 31-33 at 9-10). Consistent with his "hunter" role, Hendrixson did not manage his own accounts. (Doc. # 31-14 at 16).

During the first quarter of 2019, IBH was underperforming financially. Revenue, EBITDA, net clash flow, and gross profit were below budget, but net debt was higher than budgeted. (Doc.

# 31-9 at 62-63; Doc. # 31-13 at 14-16; Doc. # 31-21 at 2-4). Plaintiff herself acknowledged that Sockel reminded the sales team "at least once a week" sales revenue was less than budgeted. (Doc. # 31-1 at 53).

In March or April 2019, Defendant's management team held a meeting to discuss the need to improve profitability. (Doc. # 31-9 at 12; Doc. #31-10 at 20). At that meeting, Periscope recommended "looking at [Defendant's] staff, figuring out how to better integrate the team, reduce redundancy, and increase efficiency." (Doc. # 31-10 at 20). Periscope "expected . . . the managers to go back and look at their team [to] see where cuts could be made." (*Id.* at 21). Pursuant to this same reduction-in-force (RIF) mandate, COO Traci Coleman terminated six employees, and CTO William Harvey terminated two employees. (Doc. # 31-10 at 27; Doc. # 31-9 at 89).

As Sockel evaluated his team, he saw Plaintiff as a "clear cut."

> There were two people in the Birmingham office with the same job, [Plaintiff] and Ms. Pinkerton. For the first six months of my time at IBH, Ms. Pinkerton had -- was a superior performer to [Plaintiff]. So as we looked at the reorganization and what was the appropriate way to identify the least impact to the company business, it was looking across the company, looking at performance. And it was my determination that we had two people in Birmingham with essentially the same job, and one, in the case of Ms. Pinkerton, she was, by my estimation, certainly outperforming [Plaintiff]. And so as part of that reorganization and restructuring, I made the decision that Ms. Breeding, based on her performance, her position would be eliminated, and she would be terminated.

(Doc. # 31-9 at 53). On April 22, 2019, a sales opportunity with Blue Cross Blue Shield of Arizona, an account on which Plaintiff had worked for eight years and which she had forecasted to close in 2019, would not move forward. (Doc. # 31-1 at 30-31; Doc. # 31-9 at 59-60; Doc. # 31-33 at 14-16, 114-19). And as of April 24, 2019, Plaintiff had closed $8,000 in annualized project revenue, whereas Carol Pinkerton had closed $18,360 and was in the final contracting stage of a sale worth more than $50,000. (Doc. # 31-3 at 12)

That same day, Sockel presented a strategic report to Defendant's Board of Directors on

April 24. (Doc. # 31-9 at 54-60). In the report, he identified three people he was tracking for layoff:

- Likely need to transition out [Plaintiff] (B'ham) over next 60-90 days. Good attitude and effort, just not achieving desired results to date. Upgrade position and place new location.

- Need to replace B[rian] Thomas: no material new business generated over 12 months; lack of fit. Future of Wellness business will determine requirements.

  . . .

- Determine opportunity to transition out L[inda] Murphy (ID) over next 60 days. Reallocate accounts to T[anya] Baertsch (MT).

(Doc. # 31-21 at 4).

A month later on May 25, Sockel reiterated via email that he wanted to terminate these

employees. He wrote:

I have 3 employees that I am currently tracking for potential termination over the next 1-2 months:

- Brian Thomas: Performance-based

- [Plaintiff]: Performance-based

- Linda Murphy: Resources better deployed in another market.

We do not want to get into a Performance Improvement Process evaluation process for [Plaintiff] and Thomas. They are long-term sales folks who have not achieved in the past 6+ months and are unlikely to change trajectories. In the case of Murphy, we cannot afford to have a dedicated account manager in a small market like Boise[,] ID. We will have Tanya Baertsch cover that market.

(Doc. # 31-20 at 47).

Also in May (the precise date is unclear, but it was at least before May 29), Plaintiff called

Traci Coleman, who as COO oversaw IBH's human resources, because she wanted to complain

about Sockel. (Doc. # 31-1 at 35). Plaintiff left Coleman a message, and the two "played phone tag" for "several days." (*Id.*).

At 7:45 AM on May 29, Sockel informed Human Resources Director Lisa Thornton, Traci Coleman, and CEO Dan Clark of his intentions to meet with Plaintiff and asked for "clarity on message, transition and severance" because he planned to terminate Defendant "in person at the end of next week."  (Doc. # 31-20 at 46). He explained to them, "If we miss this window, it probably won't be until the end of the June with her vacation and my travel." (*Id.*). At 12:37 PM that same day, Sockel emailed the sales team, including Plaintiff, threatening to publicly shame employees who had not updated their weekly sales opportunities. (Doc. # 31-1 at 26).

Sometime later that day, Plaintiff had her first phone conversation with Coleman regarding Sockel. (*Id.* at 36; Doc. # 37 at 29). During their conversation, Plaintiff claimed that Sockel "spirals out of control," "yells at [Plaintiff]," "uses the f-bomb," and "is inappropriate." (Doc. # 31-10 at 69). She stated, "I don't think he's ever been a manager before and if he has he's never managed women." (Doc. # 31-22 at 39). She asked Coleman, "[W]hy is he picking on me? I don't understand why he's picking on me because I have got the -- I've got the most experience of anybody out here, the longest longevity. You know, why is he picking on me?" (Doc. # 31-1 at 52-53). When Coleman asked Plaintiff what she wanted Coleman to do, Plaintiff responded that she did not know and did not want to lose her job. (*Id.* at 53). She then concluded that she did not want Coleman to do anything but "just wanted to let her know." (*Id.*).

Consistent with his morning May 29 email, Sockel called Plaintiff to the American Behavioral office the following Friday, June 7, and terminated her employment pursuant to what he stated to be a "reduction in force." (Doc. # 31-1 at 53; Doc. # 31-9 at 52). During the meeting, Sockel offered Plaintiff the opportunity to continue working for a transition period until June 28,

for which she would receive severance. (Doc. # 31-33 at 24; Doc. # 31-1 at 60). Plaintiff agreed, and they planned to further discuss the transition on Monday, June 10. (Doc. # 31-33 at 24; Doc # 31-1 at 60-61).

Like Plaintiff, Linda Murphy was let go. (Doc. # 31-18 at 26). However, prior to being notified of his termination, Brian Thomas voluntarily resigned. (Doc. # 31-9 at 89). His resignation letter is undated but specifies his last day of employment as June 21, 2019. (Doc. # 31-24 at 18). Sockel solicited Tanya Baertsch's input on an appropriate termination date for Murphy since Baertsch would be responsible for transitioning her workload. (Doc. # 31-33 ¶ 34) They decided on August 9, 2019. (*Id.*).

After Murphy's termination, Sockel's sales team would have consisted of three females and three males (when Sockel started, it consisted of five females and three males). Contrary to Plaintiff's claim (Doc. # 37 at 29), there is no Rule 56 evidence indicating that Sockel hired any additional Sales Vice Presidents -- male or female -- during his tenure (Doc. # 31-37 ¶ 13), which ended in November 2019 when he took a higher-paying job elsewhere (Doc. # 31-9 at 9). IBH's successor CCO, however, did hire four Sales Vice Presidents in 2020: two males and two females, none based in Birmingham. (Doc. # 31-37 ¶ 13).

On June 7, shortly after her termination, Plaintiff called Defendant's former CEO, Ed Bosanac, a California resident. (Doc. # 31-1 at 71). Bosanac retired as CEO and officer of the board in June 2019, although his replacement began work in May 2019. (Doc. # 31-13 at 25). She called to tell him "she felt like she had been selected for termination because of her age and gender." (Doc. # 37 at 35 (citing Doc. # 31-1 at 71)). Plaintiff recorded her conversation with Bosanac without his knowledge and emailed it to herself via Defendant's computer system. (Doc. # 31-13 at 25). During the call, Bosanac told Plaintiff that her termination was not discriminatory.

(*Id.*). Bosanac testified in his deposition that he was "basically gone" at the time of her termination and had no substantial involvement in the termination decision. (*Id.*).

Also on that Friday, Plaintiff emailed confidential information from her work account to her personal account, including "reports contain[ing] summaries of those individual sales activities, opportunities, and process issues that need attention and roadblocks, upcoming sales meetings, and long-term initiatives." (Doc. # 31-1 at 64). The reports also included "names of clients and potential clients," along with "brokers [Plaintiff's] co-workers [were] dealing with and the estimated revenue expected from these contacts." (*Id.*) Plaintiff testified in her deposition that she knew that they were confidential. (*Id.*). She stated that she sent the documents to understand her position among her peers as she pursued a new position. (*Id.*)

On Saturday, June 8, Sockel emailed Plaintiff a severance agreement and informed her that she needed to have that agreement reviewed by an attorney. (Doc. # 31-1 at 60; Doc. # 31-22 at 40). He told her that, if she signed the severance agreement, she would receive her commissions from any sales closed throughout July and August 2019. (Doc. # 31-9 at 91).

On Sunday, June 9, Plaintiff emailed herself a contact list including "some of IBH's current and potential clients" and another email with "IBH's top client list by revenue" attached. (*Id.* at 65). She testified that she sent the top client list to "see why [she] got fired," and she was aware that the documents were confidential. (*Id.* at 66).

On June 10 and 11, Plaintiff worked remotely, but she testified in her deposition that her computer was not functioning properly. (Doc. # 31-1 at 61). The morning of June 10, she told Sockel that she needed more time to "process" her termination and that she would not be on the weekly call. (*Id.*). Sockel asked if Plaintiff was "up for connecting" that afternoon, and Plaintiff

responded, "Not today." (*Id.* at 62; Doc. # 31-3 at 25). Sockel offered to discuss the matter on June 11 at 9:30 AM, and Plaintiff responded, "Ok." (Doc. # 31-1 at 62; Doc. # 31-3 at 25).

On Tuesday, June 11, Lisa Thornton emailed Plaintiff to ask whether she still planned to complete transition duties and sign the severance agreement. (Doc. # 31-3 at 29). On Wednesday, June 12, Plaintiff used her personal email to send a message to Coleman. (Doc. # 31-22 at 40). Plaintiff told Coleman that her work email account was locked, that she could not communicate with her clients, that this made it impossible to fulfill her transition duties, and that she was working to meet with an attorney to review the severance agreement. (*Id.*) She also stated that the timing of her termination -- less than ten days after her initial complaint -- was retaliatory and asked Coleman to investigate her complaints of gender and age discrimination, harassment, and retaliation. (*Id.*).

Prior to emailing Coleman, Plaintiff contacted Sockel about her computer issues. (Doc. # 31-9 at 85; Doc. # 31-33 at 26). Concerned that Plaintiff had not been doing her work, Sockel accessed Plaintiff's email account and read her recently sent and received emails. (Doc. # 31-22 at 46; Doc. # 31-33 at 26). He discovered that Plaintiff had sent confidential information to her personal email account, recorded her conversation with Bosanac, and received messages from a competitor's Chief Revenue Officer. (Doc. # 31-33 at 26-27).[3] Sockel then decided, in agreement

---

[3] As Sockel put it in an email:

> Yesterday[,] I got access and reviewed her email correspondence over the past few days. She sent company confidential information (top customers and 2018 revenue) to her personal email account and actually had a recording of a conversation she had with Ed [Bosanac, IBH's former CEO] trying to get him to say she was terminated because she was female and over 50. Ed indicated that he didn't know anything about her termination which is true and adamantly defended the company. [Defendant] also sent a message to the chief revenue officer at New Directions [an IBH competitor] via LinkedIn[,] but I don't know the contents of the message.

(Doc. # 31-22 at 46-47).

with Coleman and Dan Clark, to terminate Plaintiff's employment effective Thursday, June 13, 2019. (*Id.* at 27-28).

Plaintiff asserts that Sockel acted in variety of ways during her tenure to suggest he was biased towards women. Sockel told Plaintiff and other female employees that he did not need to use a pop socket to hold his phone because he did not have small hands. (Doc. # 31-1 at 49-50, 102). Plaintiff interpreted the statement to be a veiled reference to his penis size. (*Id.* at 49-50). Next, Sockel screamed and cursed at her one-on-one and in mixed-gender group calls "several times a week." (Doc. # 31-1 at 41-42). Upon surveying two male and two female coworkers, Plaintiff understood that Sockel did not scream or curse when he spoke with them one-on-one. (*Id.* at 42-44). Also, Sockel asked Plaintiff "why she was still working" in light of her husband's financial success (*Id.* at 79). And finally, multiple times over six months, Sockel referenced certain female employees in conversation with Defendant's founder, Dr. Brian Mayhugh, which Plaintiff interpreted to mean that "there are certain employees that look really good, and they needed to be around. And those are the younger females." (*Id.* at 78).

On June 13, 2019, Plaintiff filed a charge of sex discrimination with the EEOC. (Doc. # 15-1 at 4). The EEOC issued Plaintiff a right-to-sue letter on January 24, 2020. (Doc. # 15-2 at 2). Plaintiff timely filed this action (Doc. # 1). Thereafter, Plaintiff filed her first amended complaint with this court, alleging one count of sex discrimination and one count of retaliation under 42 U.S.C. § 2000e *et seq.*; one count of wage discrimination under 29 U.S.C. § 206(d); and one count of invasion of privacy under the laws of the State of Alabama.[4]

---

[4] In her first amended complaint, Plaintiff also advanced an age discrimination and retaliation claim and a negligence claim; however, she voluntarily dismissed these claims in her Summary Judgment Response. (Doc. # 37 at 3).

## II.    Standard of Review

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see* FED. R. CIV. P. 56(c). The movant must show the court that there is a basis for granting summary judgment and identify the evidence in the pleadings that demonstrates the absence of a genuine issue of material fact. *Id.* at 323. Once the movant has met its burden, Rule 56 requires the non-movant to specify facts beyond the pleadings (including in affidavits, depositions, answers to interrogatories, or admissions on file) that show a genuine issue for trial. *Id.* at 324.

The substantive law determines which facts are material or irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Any reasonable doubts about the facts, or justifiable inferences derived therefrom, are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249. The non-movant cannot survive a properly supported motion for summary judgment by asserting "mere allegations"; it must provide at least some evidence to support each element essential to its case at trial. *Id.* at 252; *see also Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997).

A court must grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that

party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Thus, a court's inquiry in a Rule 56 motion is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52; *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

The Eleventh Circuit has interpreted *Celotex* to require that, as to issues on which the movant would bear the burden of proof at trial, a

> party must show *affirmatively* the absence of a genuine issue of material fact: it must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial. In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party. If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the non-moving party, in response, come[s] forward with significant, probative evidence demonstrating the existence of a triable issue of fact.

*Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (quoting *U.S. v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)).

## III. Discussion

Defendant argues that it is entitled to summary judgment on Plaintiff's four claims: (1) Title VII sex discrimination; (2) Title VII retaliation; (3) violations of § 206(d) of the Equal Pay Act; and (4) false light invasion of privacy under Alabama state law. (Doc. # 15).[5] The court

---

[5] Defendant also argues that it is entitled to summary judgment on Plaintiff's age discrimination and retaliation claim, along with her negligence claim. However, as explained, *supra* note 4, Plaintiff voluntarily dismissed these claims in her summary judgment response. (Doc. # 37 at 3).

addresses each claim, in turn. After careful review, the court concludes that Defendant's Motion for Summary Judgment (Doc. # 30) is due to be granted.

### A.    Plaintiff Has Not Established a Mixed-Motive Sex Discrimination Claim

Plaintiff asserts a mixed-motive sex discrimination claim, alleging that her "sex was a motivating factor in Defendant's decision to subject [her] to adverse employment actions[.]" (Doc. # 15 ¶ 48; *see also* Doc. # 37 at 30). "[A]n adverse employment action motivated by both legal and illegal reasons constitutes actionable discrimination under Title VII." *Quigg v. Thomas Cty. Sch. Dist.*, 814 F.3d 1227, 1236 (11th Cir. 2016) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). A plaintiff "can succeed on a mixed-motive claim by showing that illegal bias, such as bias based on sex or gender, 'was a motivating factor for' an adverse employment action, 'even though other factors also motivated' the action." *Quigg*, 814 F.3d at 1235 (quoting 42 U.S.C. § 2000e-2(m)). A plaintiff "can prove a mixed-motive case with direct or circumstantial evidence." *Id.* at 1237 (citing *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101-02 (2003)).

The familiar *McDonnell Douglas* framework is not employed at summary judgment to evaluate a mixed-motive claim. *Id.* at 1238.[6] Rather, "[t]o avoid summary judgment, a plaintiff raising a mixed-motive claim must offer evidence sufficient to convince a jury that: (1) the [employer] took an adverse employment action against [her]; and (2) a protected characteristic was *a* motivating factor for the [employer]'s adverse employment action." *Bowen v. Manheim Remarketing, Inc.,* 882 F.3d 1358, 1364 (11th Cir. 2018) (internal quotation marks omitted).

---

[6] Generally, in cases involving a RIF, a modified *McDonnell Douglas* framework applies because "the employer seldom seeks a replacement for the discharged employee." *Mauter v. Hardy Corp.*, 825 F.2d 1554, 1557 (11th Cir. 1987); *see Standard v. A.B.E.L. Servs., Inc*., 161 F.3d 1318, 1331 (11th Cir. 1998). But because Plaintiff proceeds solely under a mixed-motive theory, that modified framework is inapplicable here. (Plaintiff also disputes whether there was a RIF in the first instance. (*See* Doc. # 37 at 33).)

It is undisputed that Plaintiff was subjected to an adverse employment action when she was terminated. *See Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008). Therefore, the court must determine whether Plaintiff has presented sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that sex was a motivating factor in Plaintiff's termination. *Quigg*, 814 F.3d at 1239. In the context of her claim here, Plaintiff must not only show that the Sockel is biased against women, but also that Sockel acted on that bias when he terminated Plaintiff. After careful review, the court concludes Plaintiff has failed to make that showing.

Plaintiff points to what she contends are four "gender-biased comments" that support her discrimination claim. (Doc. # 37 at 32). Generally, "[r]emarks at work that are based on sex stereotypes do not inevitably prove that gender played a part in a particular employment decision." *Price Waterhouse*, 490 U.S. at 252. Rather, a court must evaluate the remarks in the overall context of the Rule 56 record to see if they constitute substantial evidence of sex discrimination.

First, Plaintiff notes that Sockel told "the Board of Directors that clients only liked Pinkerton [Plaintiff's female co-employee] because of Pinkerton's physical appearance." (Doc. # 37 at 32). Plaintiff's deposition testimony, however, does not support this assertion. In her deposition, Plaintiff characterized what Sockel said like this: "[T]here are just female employees that we know why [clients] want[] to keep them around." (Doc. # 31-1 at 77). She elaborated that she "d[id]n't remember specifically who he was talking about" and "didn't hear them say anything specific about looks." (*Id.* at 77, 96). But even if Sockel had said the "who" and the "why," it is dubious whether this would support Plaintiff's claim that Sockel was biased against women. In fact, it would at best seem to suggest that Sockel perceives some clients to favor some women due to appearances.

Second, Plaintiff argues that "Sockel made jokes about the size of male genitalia" (Doc. # 37 at 32). In her deposition, Plaintiff characterized what Sockel said like this: "No man would ever want to admit that they had to use [a pop socket] to hold a phone because that would mean they had small hands if you know what I mean[,] [Bosanac] must have small hands, ha, ha, ha, if he let y'all order those because I heard he likes them." (Doc. # 31-1 at 49). Sockel is not on trial for being boorish. A joke about hand size and penis size is offensive but is not probative of a bias against women.

Third, Plaintiff alleges that Sockel "stereotyped the female sales executives as 'farmers' while searching for, and hiring, male 'hunters.'" (Doc. # 37 at 32). But Plaintiff asserts that Sockel's use of "farmers" refers to only to female sales executives without providing evidence to dispute Sockel's sworn statement that the term "farmers" indicates "executive operational responsibilities and/or spen[ding] a considerable amount of time performing account management duties," responsibilities held by men -- Brian Thomas, Joe Bosche -- and women -- Plaintiff, and Carol Pinkerton (Doc. # 31-33 at 3-4).

Fourth, Plaintiff asserts that "Sockel asked [her] why she was still working because of her husband's income." (Doc. # 37 at 32). This is Plaintiff's most compelling "remark" evidence. Sockel's statement is, at a minimum, boorish. But it may also indicate sex-stereotyping. *But see Stone v. Galaxy Carpet Mills, Inc.*, 841 F. Supp. 1181, 1187 (N.D. Ga. 1993) ("The [c]ourt will not take judicial notice, as Plaintiff apparently wants, that Defendant clearly made the assumption that [the plaintiff], as a woman, was unable to travel and that he needed a man who could travel and that this is sex stereotyping." (cleaned up)). The question is whether this evidence when coupled with other Rule 56 evidence would allow a jury to infer that Sockel had animus against women. *See Godwin v. Wellstar Health Sys., Inc.*, No. 1:12-CV-3752-WSD, 2016 WL 7487912,

14

at \*6 (N.D. Ga. Oct. 6, 2016) (holding that employer's "comments to Plaintiff asking her age and why she was still working at her age rather than at home with her husband," *along* with a robust Rule 56 record suggesting age discrimination, was enough to survive summary judgment). The court concludes it would not.

"[W]hen an employee raising a mixed-motive claim relies solely on remarks that indirectly evidence discrimination, the employee must show that circumstances surrounding the remarks create a genuine issue of material fact that the employer 'actually relied on her sex or gender in making its decision.'" *Quigg*, 814 F.3d at 1241 (quoting *Price Waterhouse*, 490 U.S. at 251). None of Sockel's remarks show that he terminated Plaintiff because he is biased against women. The question then is whether her additional argument allows her to survive summary judgment. They do not.

Plaintiff points to a series of Sockel's actions that she claims are further evidence of a discriminatory motive. First, Plaintiff alleges that "Sockel yelled, screamed, and cursed at [Plaintiff] in a manner which he did not use with male coworkers." (Doc. # 37 at 28). But Plaintiff failed to establish that this yelling was gender-based. *See Galdamez v. DHL Air Exp. USA*, 578 F. App'x 887, 897 (11th Cir. 2014). Plaintiff admits that he yelled at her about work-related issues and that he also yelled in group meetings where both males and females were present. (Doc. # 31-1 at 42-44). This evidence is not probative of discriminatory motive.

In addition, Plaintiff alleges that "Sockel threatened to publicly shame [her]." (Doc. #37 at 28). But this allegation refers to the single email that Sockel sent to the entire sales team -- not just to Plaintiff -- threatening to publicly shame anyone who had not updated their weekly sales opportunities. This evidence, therefore, is also not probative of discriminatory motive.

Plaintiff also argues that Sockel "manufactured a reduction in force, but terminated only two women, Plaintiff and Linda Murphy." (*Id.* at 31). This assertion fails to account for the fact that Periscope directed IBH's managers in March or April 2019 to identify employees for termination. (Doc. # 31-9 at 12; Doc. # 31-10 at 20-21). Indeed, in light of this mandate, COO Traci Coleman terminated six employees, and CTO William Harvey terminated two employees. (Doc. # 31-10 at 27; Doc. # 31-9 at 89). The undisputed evidence shows that Sockel and others were directed to assess which employees should be laid off.

Plaintiff also attempts to undermine the Rule 56 evidence about Sockel's plan to terminate Brian Thomas, along with Plaintiff and Murphy. In April 2019, Sockel identified all three for termination (Doc. # 31-21 at 4), and he did so again the next month (Doc. # 31-20 at 47). It is true that unlike Plaintiff and Murphy, Thomas was not involuntarily terminated. But this was because he resigned before Sockel communicated the termination decision to him. Plaintiff argues that Sockel never "truly intended to layoff Thomas." (Doc. # 37 at 8). Plaintiff argues that Thomas's resignation was a voluntary resignation because he "was unhappy that the sales compensation plan had been changed by Sockel." (Doc. # 37 at 8). But, she does not point to any Rule 56 evidence that contradicts Sockel's clearly-stated intention and plan to terminate Thomas. And, she has not met head on the undisputed evidence that Sockel told those above him that Thomas was to be discharged along with Plaintiff and Murphy in the RIF.

Plaintiff also argues that "Thomas resigned because his contract expired." (Doc. # 37 of 43). But, this argument is also without merit. Thomas' initial three-year contract expired on January 26, 2018. (Doc. # 31-24 at 11). He resigned effective June 21, *2019*. (Doc. # 31-24 at 18). After his three-year contract expired, he signed what appears to be an at-will employment agreement, stating "[e]ffective January 26, 2018, your base salary is $120,000 plus commission

16

and will be reviewed annually. This is neither a guarantee of employment nor an employment contract." (*Id.* at 16). So, Thomas had been working well past the time his three-year contract expired.

Finally, Plaintiff argues that Sockel hired Peter Hendrixson to replace her. (Doc. # 37 at 29). But Sockel hired Hendrixson in a "pure hunter" role, while Plaintiff retained significant account-management duties. Also, the farmers on Sockel's team included males and females, and the Rule 56 record does not reasonably support the assertion that his reference to farmers and hungers suggests he targeted Plaintiff specifically or women generally for replacement. Sockel mentioned Plaintiff in the context of termination for the *first* time in April 2019, whereas Sockel began his search for a hunter as early as November 2018 and hired Hendrixson in January 2019. In April 2019, he announced to the board his intention to terminate Plaintiff, Murphy, and Thomas—all farmers, but not all females.

In summary, the Rule 56 record could not reasonably support a jury finding that Sockel terminated Plaintiff because she is a woman. The decision to discharge Plaintiff was part of a RIF. "[A] reduction in force generates adverse employment actions, which of course are quite lawful if not based on impermissible characteristics[.]" *Rowell v. BellSouth Corp.*, 433 F.3d 794, 798 (11th Cir. 2005). Such is the case here. It is the well-settled law of the Eleventh Circuit that this court does not sit as a "super-personnel department that re-examines an entity's business decisions." *Alphin v. Sears, Roebuck & Co.*, 940 F.2d 1497, 1501 (11th Cir. 1991). Keeping in mind the Eleventh Circuit's admonishments not to revisit a business entity's legitimate decisions, including the decision to implement a RIF, the court will not do so here. The record makes clear that sometime *after* Hendrixson's hiring, IBH's executives were directed to lay off employees. The COO terminated six employees; the CTO terminated two employees. Sockel identified Plaintiff,

along with two others, one of whom was male, for termination and relied on objective criteria in making his selection. Based on the undisputed summary judgment evidence, no reasonable jury would conclude that Sockel was motivated to select Plaintiff for the RIF because of her gender.

**B.**     **Plaintiff Has Not Established a *Prima Facie* Case of Retaliation Under Title VII**

Plaintiff has articulated two distinct theories to establish a retaliation claim. First, in her amended complaint and EEOC charge, Plaintiff alleges that her termination on June 7, 2019 was in retaliation for her initial complaint to COO Coleman. But, as discussed below, Plaintiff has abandoned this argument in her response to Defendant's motion for summary judgment. Rather, in her summary judgment response, Plaintiff relies on a second and wholly different theory: the shortening of her termination period and the rescission of her separation offer were in retaliation because she informally complained to Bosanac (IBH's former CEO) about her original termination. (Doc. # 37 at 35-39). This theory fails for two reasons. First, a plaintiff may not amend her complaint by bringing a new retaliation claim in a summary judgment response. Second, and in any event, her new theory is not supported by the Rule 56 record.

**i.**     **Plaintiff Abandoned the Retaliation Claim Asserted in Her Pleadings**

In her amended complaint, Plaintiff asserts that she "suffered retaliation [in the form of termination] after she complained of gender discrimination" to Traci Coleman, IBH's Chief Operations Officer and head of the Human Resources Department. (Doc. # 15 ¶ 54; *see also id.* ¶ 52). Discussion of this claim, however, is nowhere to be found in Plaintiff's summary judgment response. It is well settled that "the onus is upon the part[y] to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 598 (11th Cir. 1995) (en banc); *see also Clark v. City of Atlanta, Ga.*, 544 F. App'x 848, 855 (11th Cir. 2013) ("The district court, therefore,

properly treated as abandoned the [plaintiff's] . . . claims, which were alleged in the complaint, but not addressed in opposition to the motion for summary judgment."). Plaintiff raises a totally new retaliation claim in her summary judgment response. (*See* Doc. # 37 at 32-36). The court addresses that new claim below. But, because her original claim has been abandoned, it is unnecessary to analyze it.

But, assuming it was not abandoned (and to be clear, it has been) Plaintiff's original claim fails. Where, as here, evidence of retaliation is entirely circumstantial, the court applies the *McDonnell Douglas* burden-shifting framework. *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1310 (11th Cir. 2016). To succeed on a retaliation claim, a plaintiff must show that: (1) she engaged in protected activity or expression; (2) she suffered an adverse employment action; and (3) the adverse employment action was causally connected to the protected conduct. *Furcron*, 843 F.3d at 1310; *Goldsmith v. Bagby Elevator Co.,* 513 F.3d 1261, 1277 (11th Cir. 2008). "Once a *prima facie* case has been established, the employer may come forward with legitimate reasons for the employment action to negate the inference of retaliation." *Furcron*, 843 F.3d at 1310 (alteration adopted) (quoting *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993)). If the employer does so, "the burden shifts back to the employee to demonstrate, by a preponderance of the evidence, that the employer's reasons are pretextual." *Id.* At this stage, the employee's burden "merges with the ultimate burden of persuading the court that the plaintiff has been the victim of intentional discrimination." *Id.*

Further assuming that Plaintiff's first complaint to Coleman was protected activity and that Plaintiff's termination constituted an adverse employment action, Plaintiff cannot establish a causal link between the complaint and termination. No reasonable jury could find that Sockel knew about Plaintiff's complaint at the time that he decided to terminate her employment. Sockel

notified Thornton and Coleman of his decision to meet with Plaintiff and terminate her employment at 7:45 AM on May 29, 2019. (Doc. # 31-1 at 53; Doc. # 31-9 at 91; Doc. # 31-20 at 46-60). Plaintiff's phone call to Coleman did not occur until some point later that day. (Doc. # 31-1 at 36). It is undisputed that Sockel made the termination decision no later than his early morning May 29 email (Doc. # 37 at 23), so it is impossible that he was motivated to make that decision based on a phone call that occurred *later* that same day. *See McCollum v. Bolger*, 794 F.2d 602, 610-11 (11th Cir. 1986) (affirming judgment for defendant and holding that the plaintiff failed to prove a prima facie case of retaliation where evidence at trial showed that the decision maker did not know that the plaintiff had engaged in protected conduct); *see also Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006) ("[I]n a retaliation case, when an employer contemplates an adverse employment action before an employee engages in protected activity, temporal proximity between the protected activity and the subsequent adverse employment action does not suffice to show causation."). Thus, even if not abandoned, Plaintiff's first retaliation claim would fail on the merits.

### ii. Plaintiff Cannot Raise a Retaliation Claim for the First Time in a Summary Judgment Response

Plaintiff's second theory fails because it was not included in Plaintiff's amended complaint. Plaintiff's first claim "was the only retaliation claim pled in the [amended] complaint, and 'a plaintiff cannot amend her complaint through argument made in her brief in opposition to the defendant's motion for summary judgment.'" *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 859 (11th Cir. 2020) (alterations adopted) (quoting *Miccosukee Tribe of Indians of Fla. v. United States*, 716 F.3d 535, 559 (11th Cir. 2013)). While a non-moving party may assert additional facts in support of an existing claim, she cannot invent a wholly new claim in a summary judgment response. *See Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006) (explaining that plaintiff was not entitled to raise a new statutory basis for interference claim in

summary judgment response); *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004). "At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with FED. R. CIV. P. 15(a)." *Hurlbert*, 439 F.3d at 1297 (quoting *Gilmour*, 382 F.3d at 1315).

Plaintiff's first amended complaint alleges retaliation only on the basis of her internal complaint to Coleman and subsequent termination on May 29. (Doc. # 15 ¶¶ 52-54). Her response to Defendant's summary judgment motion offers an entirely new claim—that Sockel retaliated against her for calling Bosanac, IBH's former CEO and Plaintiff's original hirer, *after* her termination. (Doc. # 37 at 35).[7] Plaintiff's new claim involves a different protected activity (a complaint to Bosanac, not Coleman), a different adverse employment action (a shortened termination period after her discharge was already announced, not the decision to discharge), and necessarily a new causal link (a purported link between her call to Bosanac and the decision to shorten her termination period). This new claim cannot be brought for the first time in Plaintiff's summary judgment response.

But, even if this new claim could be belatedly asserted (and, again, it cannot), it would still fail. First, at the time of her communication with him, Bosanac was the former CEO. Although the court does not decide the case on this basis, there is at least some question whether complaining to a former employee is a protected activity. More importantly, Sockel had a clear legitimate reason to terminate Plaintiff effective immediately: she forwarded confidential information to her personal email account. In her summary judgment response, Plaintiff does not dispute that she "forwarded spreadsheets showing her clients and sales to her personal email address." (Doc. # 37

---

[7] Plaintiff recorded the call without Bosanac's consent. (Doc. # 31-1 at 71-72). Because Bosanac is a California resident, this was illegal. *See* Cal. Penal Code § 632.

at 26). These materials are plainly covered by IBH's Confidentiality Agreement which forbids the "use or transfer of" "[p]roprietary and confidential business information," and specifies that doing so "may be cause for disciple up to discharge." (Doc. # 31-2 at 51). And, in fact, there is Rule 56 evidence that Sockel has shortened the termination period "of at least one other individual for forwarding confidential information to their personal email." (Doc. # 31-33 ¶ 38). Thus, Plaintiff's second retaliation claim would also fail on the merits

### C.   Plaintiff Has Neither Established a *Prima Facie* Case Nor Rebutted Defendant's Defense of Wage Discrimination Under the Equal Pay Act

Plaintiff also argues that her Equal Pay Act ("EPA") rights were violated because she and Hendrixson performed equal work for unequal pay. (Doc. # 37 at 40). While Hendrixson was paid $125,000, she was paid only $95,481. (*Id.*). Clearly, there was unequal pay. But, there was not unequal work.

The EPA is "directed only at wage discrimination between the sexes and forbids the specific practice of paying unequal wages for equal work to employees of the opposite sex." *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1526 (11th Cir. 1992); *see* 29 U.S.C. § 206(d)(1). To establish a *prima facie* case under the EPA, a plaintiff "must show that an employer pays different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974) (quoting 29 U.S.C. § 206(d)(1)); *see also Miranda*, 975 F.2d at 1532. "A plaintiff establishes a *prima facie* case by comparing the jobs held by the female and male employees, and by showing that those jobs are substantially equal, not by comparing the skills and qualifications of the individual employees holding those jobs." *Miranda*, 975 F.2d at 1533.

"Once the disparity in pay between substantially similar jobs is demonstrated, the burden shifts to the defendant to prove that a 'factor other than sex' is responsible for the differential." *Id.* (citing *Mitchell v. Jefferson Cty. Bd. of Educ.*, 936 F.2d 539 (11th Cir. 1991)). "The burden to prove these affirmative defenses is heavy and must demonstrate that 'the factor of sex provided *no basis* for the wage differential.'" *Steger v. General Elec. Co.*, 318 F.3d 1066, 1078 (11th Cir. 2013) (quoting *Irby v. Bittick*, 44 F.3d 949, 954 (11th Cir. 1995)). And, "[a]lthough an employer may not rely on a *'general practice'* as a factor 'other than sex,' it may consider factors such as the 'unique characteristics of the same job; . . . an individual's experience, training or ability; or    . . . special exigent circumstances connected with the business.'" *Id.* (quoting *Irby*, 44 F.3d at 955) (emphasis removed) (internal citation omitted). "Once the employer's burden is met, the employee 'must rebut the explanation by showing with affirmative evidence that it is pretextual or offered as a post-event justification for a gender-based differential.'" *Id.* (citing *Irby*, 44 F.3d at 954).

No reasonable jury could find that Plaintiff has made a *prima facie* case under the EPA. Plaintiff's sales goal was $200,000 (Doc. # 31-1 at 22); Hendrixson's was, at minimum, $500,000.[8] Plaintiff was Vice President of Sales and Marketing (Doc. #31-9 at 26-27); Hendrixson was Vice President of Business Development (Doc. # 31-14 at 3). Of course, as Plaintiff argues, neither a distinction in sales goals nor job titles is necessarily sufficient to defeat a *prima facie* case. (Doc. # 37 at 41-42 (citing *Slattery v. Precision Response Corp.*, 167 Fed. App'x. 139 (11th Cir. 2006); *Joyner v. Town of Elberta*, 22 F. Supp. 1201, 1207 (S.D. Ala. 2014))). Nevertheless, the Eleventh Circuit requires "strict similarity" between jobs for the work to be substantially equal. *Mulhall v. Advance Sec., Inc.*, 19 F.3d 586, 593 (11th Cir. 1994). In *Mulhall*, the plaintiff and comparator performed nearly identical administrative work, but the comparator's job also required distinct

---

[8] While the job description included a sales goal of $500,000-$1 million, Sockel and Hendrixson agree that Sockel's offer to Hendrixson required a $1 million sales goal. (Doc. # 31-14 at 14, 48; Doc. # 31-33 at 9–10).

"investigative skills." *Id.* Despite recognizing that the comparator's administrative work was substantially similar to the plaintiff's, the Eleventh Circuit held that, because "investigative skills" played "more than an incidental part of [the comparator's] position," the plaintiff failed to establish a prima facie case. *Id.*

So, too, here. In addition to their disparate sales goals, Plaintiff's and Hendrixson's roles differed substantially. One of Plaintiff's primary duties was account management. (Doc. # 31-1 at 24). In contrast, Hendrixson had *no* account management responsibilities. (Doc. 31-14 at 64). Account management surely requires administrative skills distinct from those required for outside sales—those required of Hendrixson in his "pure hunter" role. And a pure hunter does not benefit from opportunities arising from ongoing relationships with clients available to a salesperson with account-management duties. A pure hunter position requires a different skillset. Further, tasks that took up 40% of Plaintiff's time were not part of the hunter job's duties and plainly represented more than an incidental part of Plaintiff's position. Accordingly, Plaintiff has failed to establish a *prima facie* case because no reasonable jury could conclude that she and Hendrixson performed substantially equal work.

Summary judgment is also appropriate because no reasonable jury could find that Defendant has not proven, by a preponderance of the evidence, that any difference in pay is justified by a factor other than sex. First, Hendrixson's pay of $125,000 was nearly identical to the pay he received in his previous employment. While prior pay alone is not sufficient as a factor other than sex to defeat a *prima facie* case, "there may be other business reasons that justify use of prior salary[.]" *Irby*, 44 F.3d at 955-56. Here, Defendant had such reasons. The record indicates that Defendant placed high value on the "pure hunter" role and accordingly offered a competitive

salary to lure Hendrixson away from his prior employment. *See Leatherwood v. Anna's Linens Co.*, 384 Fed. App'x 853, 860 (11th Cir. 2010).

Plaintiff argues that Defendant's "'pressing need' for a new 'hunter'" is pretextual because Sockel could not have adequately considered his team's needs at the time he contacted the recruiter in November. (Doc. # 37 at 42 (source of quotation not provided)). But, that argument merely second guesses the business judgment of Defendant (and Sockel particularly) in making a determination that a new "hunter" job was required. Plaintiff also contends that Sockel "searched for and hired male candidates at higher salaries," even though she "may have been the 'hunter' Sockel was looking for[.]" (*Id.*). The record does not support her contention that Sockel searched exclusively for male employees. Rather, he contacted the recruiting firm and considered their recommendations. (Doc. # 31-33 at 6). Nor is it relevant that Sockel failed to consider hiring her into the role eventually filled by Hendrixson. He did not interview anyone on the sales team, male or female, for the hunter role. Plaintiff's argument assumes that a hunter and farmer role require similar qualifications. (Doc. # 37 at 42). But, as discussed above, the hunter position required different skills, served a different purpose, and had a sales goal two-and-a-half to four times greater than Plaintiff's.

Thus, the Rule 56 record does not support the conclusion that Defendant paid Hendrixson more than Plaintiff because of sex.

### D.   The Court Will Not Exercise Its Supplemental Jurisdiction over Plaintiff's Invasion-of-Privacy Claim

In her complaint, Plaintiff asserts that "Defendant, through Sockel, placed [her] in a false light." (Doc. # 15 ¶ 82). Because Defendant is entitled to summary judgment on all of Plaintiff's federal claims, the court must determine whether to exercise its discretion to entertain supplemental jurisdiction over Plaintiff's state-law claim. Under 28 U.S.C. § 1367(c)(3), "[a]

district court may decline to exercise supplemental jurisdiction over a [state law] claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction." In that event, a plaintiff may have the option to refile those claims in state court, as appropriate. Although the court recognizes that there may be meritorious arguments weighing in favor of addressing and dismissing Plaintiff's state law claim, the court nevertheless finds it appropriate to decline to exercise supplemental jurisdiction here. To be sure, the Eleventh Circuit has "encouraged district courts to dismiss any remaining state claims when . . . the federal claims have been dismissed prior to trial." *Raney v. Allstate Ins. Co.,* 370 F.3d 1086, 1089 (11th Cir. 2004). The court elects not to exercise supplemental jurisdiction over Plaintiff's remaining state law claims. Plaintiff's invasion of privacy claim is due to be dismissed without prejudice.

## IV.     Conclusion

For all the foregoing reasons, Defendant's Motion for Summary Judgment (Doc. # 30) is due to be granted. An Order consistent with this Memorandum Opinion will be entered.

**DONE** and **ORDERED** this January 4, 2022.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE